Filed 9/4/20  P. v. Lehman CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088549 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE003743) |
| v. | |
| WESLEY ALAN LEHMAN, | |
| Defendant and Appellant. | |

A jury convicted Wesley Alan Lehman of one count of residential burglary with a finding that the inhabitant of the residence was present during the burglary.  Lehman's defense at trial, where he represented himself and testified, was that he was not the person who burglarized the residence.

On appeal, Lehman contends that:  (1) after the jury reported an impasse, the trial court abused its discretion in instructing the jury to continue deliberating without inquiring of jurors whether there was a reasonable probability that a verdict could be reached; (2) the court's so-called "firecracker" instruction to the jury to continue deliberating was coercive; (3) the portion of the pattern instruction on eyewitness

1

identification, CALCRIM No. 315, which directed the jury to consider the certainty with which the identification was made, violated due process; (4) the pattern instruction on possession of stolen property as evidence of a theft crime, CALCRIM No. 376, constituted an alternate, legally invalid theory of guilt; and (5) the trial court should have granted defendant's motion for discovery of the personnel records of the lead detective, Carlos Vina, under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

We reject Lehman's claims of error on issues one through four as forfeited by Lehman's failure to object, lack of merit, or both.

As for the *Pitchess* motion, on appeal Lehman attempts to narrow its focus to Detective Vina, based on Lehman's report that the detective was motivated by a personal relationship with the victim. However, Lehman's motion alleged a conspiracy of multiple officers to plant and tamper with evidence and make false statements. On this basis, the trial court found the motion lacked good cause. Even if it were permissible to change his theory on appeal, his new theory alleging misconduct by only Detective Vina would not present an "alternate version of the facts" that is "internally consistent" sufficient for a finding of good cause. (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316-1318 (*Thompson*); *People v. Sanderson* (2010) 181 Cal.App.4th 1334, 1340-1341 (*Sanderson*).)

Lastly, the trial court sentenced Lehman to two additional years under Penal Code section 667.5, subdivision (b), for two prior prison terms he served.[1] While this appeal was pending, Senate Bill No. 136 (Stats. 2019, ch. 590) became effective and changed the rules governing prior prison term enhancements. The parties agree that his priors no longer qualify. We concur and accordingly strike the sentence for Lehman's prior prison terms.

---

[1] Statutory references are to the Penal Code unless otherwise designated.

The judgment is affirmed as modified.

## FACTUAL BACKGROUND

Brett L. testified that, on January 4, 2018, he left his home in Elk Grove at about 8:00 a.m. for work. He returned about 1:15 p.m. and walked into the kitchen. He heard footsteps coming down the hallway. A man came around the corner of the hallway. The man was startled when he saw Brett L. The man said, "hey, how you doin'," turned and went out the back.

Brett L. described the intruder as a Caucasian male, 23 to 25 years old, about six feet to 6 feet 2 inches tall, with a week or two of facial hair growth, and wearing a green hooded sweatshirt. The hood was not all the way on and Brett L. could see the man's face. Also, Brett L. had turned on the kitchen lights and there was midday light coming through the windows. Brett L. looked at the man's face for two or three seconds. Brett L. identified Lehman in the courtroom as the man he had seen in his home.

Brett L. started looking through the bedrooms. He could see that someone had gone through the dresser drawers and the master bedroom was a mess. In the master bathroom, the window was open and there were muddy footprints on the countertop. Brett L. determined that four laptops and some banking records were missing. About an hour later, police officers recovered a backpack belonging to Brett L. containing four laptops, a camera, some cables, and four passports.

After the man went out the back, Brett L. saw a flash of movement at the back fence adjacent to a park. Brett L. went outside and looked along the fence line. He saw a gentleman with a young child playing in the park. Brett L. asked him if he had seen somebody with a backpack jump the fence and the man answered, yes.

At about 1:30 p.m. on January 4, 2018, an Elk Grove resident looked out the window and saw a Caucasian man walking down the street. He was wearing black pants, a white tank top and a long-sleeved black sweatshirt. He was carrying a black backpack on his back. He stopped in front of a neighbor's trash can across the street, opened the lid

3

and put the sweatshirt in. A moment later, the man started running down the street. When the police arrived, the resident told them what he had seen and they opened the garbage can. A black sweatshirt (with two gloves in a pocket) and T-shirt, none of which belonged to the neighbor, were retrieved from the can. The resident got a "pretty good look" at the man but could not identify him in police photos.

At about 2:00 p.m. on January 4, 2018, Sheriff's Deputy Pedro Avalos, a school resource officer, was in a patrol car monitoring Elk Grove Police Department radio when he heard a report of a residential burglary where the suspect was said to be heading in his vicinity. The suspect was described as male, Caucasian, wearing a hooded sweatshirt. The officer saw in front of him a Caucasian male wearing a white tank top and dark pants and carrying a dark-colored backpack. The officer planned to drive past the man because he did not fit the description of the suspect as wearing a hoodie. As Deputy Avalos got close, the man turned and looked back, and then did so again. Deputy Avalos made eye contact with the man and had a clear view of his face. The man dropped the backpack and ran. Deputy Avalos identified Lehman in court as the man.

The next day Detective Vina returned to the area to determine if there was any evidence in the area of the fence behind Brett L.'s home. On the park side of the fence pushed down into the bushes, Detective Vina found a red baseball cap with a black bill and the word "California" and a California bear on it.

About six weeks after the burglary, Detective Vina showed Brett L. a photographic lineup. Brett L. testified that the detective put a series of photos before him and he narrowed it down to two people. Brett L. then picked the one out of the two that he was confident was the person who had burglarized his home.

Detective Vina testified somewhat differently. The detective stated that Brett L. eliminated four of the six photos and said the other two had "similarities to the suspect that he viewed in his home, but that he could not say for certain." The photo of Lehman

was one of the photos Brett L. picked. Brett L. did not say whether he was leaning one way or the other between the two photos.

Detective Vina also showed Deputy Avalos a photographic lineup. Deputy Avalos selected one photo out of the six he was shown. He testified that he was confident the photo he selected was the person he saw on January 4, 2018, and that person was Lehman sitting in court. Deputy Avalos testified he was 100 percent certain that he picked the photo of the person he saw. On cross-examination by Lehman, Deputy Avalos testified of the photo, "I know it was you. It looked just like you."

A criminalist examined a black hooded sweatshirt, a black T-shirt, a black left-handed Nike batting glove, a black right-handed knit glove, and a black and red California Republic hat. The criminalist obtained a DNA reference sample from Lehman. The items examined included a mixture of DNA from more than one individual. Lehman was determined to be a potential DNA contributor to the sweatshirt, T-shirt and hat. Lehman was not a contributor to the DNA on the Nike batting glove and the knit glove was uninterpretable. Lehman contributed 72 percent of the DNA to the hat, 87 to 91 percent to the sweatshirt, and 93 percent to the T-shirt.

Lehman's shoes were compared to a photograph of the muddy footprint at Brett L.'s residence. The sole pattern on the Air Jordan shoes obtained from Lehman was very similar to the impression left at the residence.

Savannah Espinoza, Lehman's girlfriend, testified on his behalf.[2] From December 2017 to February 2018, Espinoza lived with Lehman, a person named Connor, a person named Bob, and other unnamed people at a house on Misty Meadow Way in Elk Grove. Espinoza testified that it was common for many people to live in the house, to do laundry together, and to borrow outfits from each other while they did their laundry.

---

[2] On cross-examination, Espinoza admitted she gave a false name to police in 2015 and committed forgery in 2017.

Espinoza testified that, on January 4, 2018, before noon, she and Lehman left the house on Misty Meadow Way to visit her sister in Fair Oaks. Espinoza's mother drove. It took about an hour to get to there. That night they went to the hospital at 9:00 p.m. and didn't leave until 3:00 or 4:00 the next morning, arriving back at the house at 5:00 to 6:00 a.m. Upon arrival, they noticed Lehman's sweatshirt and hat were missing.

Lehman testified on his behalf. He admitted a conviction in 2009 for possession of a firearm by a felon and a 2015 stolen vehicle conviction.

Lehman testified that, on January 4, 2018, he and Espinoza left the Misty Meadow Way house at about noon. Espinoza's mother picked them up and drove them to the house in Citrus Heights of someone Espinoza refers to as her sister. Later that night, Espinoza had "medical issues" and had to go the hospital. Lehman stayed the entire night with her and they did not return to the Misty Meadow Way house until 4:00 in the morning. When they returned, the sweatshirt and the hat were missing.

Lehman testified that he and Connor had been involved in an altercation. Lehman testified that Connor did not like him and "had any motivation and every motivation to do something that could land negatively on my behalf."

On cross-examination, Lehman admitted that, on the day he was arrested, when Detective Vina asked if he was living at the Misty Meadow Way house, Lehman said he was just there to pick up furniture. Lehman admitted that he did not tell Detective Vina he had been in Citrus Heights on January 4, 2018. Lehman admitted that, when Detective Vina told him his DNA had been found on some clothes that a suspect had discarded and asked if others borrowed his clothes, Lehman did not say that he lived in a house where they shared clothes. Lehman admitted that he did not mention that when he came home after January 4, 2018, he noticed clothing items were missing. Lehman admitted that during a videotaped interview with Detective Vina, when Lehman was left alone, he wiped the rim of the water bottle from which he had been drinking. Lehman testified that

after being told his DNA was on the gloves, which he did not think possible, he wiped the water bottle to avoid being framed.

## DISCUSSION

*Inquiry Regarding Reasonable Probability That Deadlocked Jury Could Reach a Verdict*

Lehman contends it was an abuse of discretion for the trial court "to instruct the jury to continue their deliberations without speaking to a single juror and without conducting any inquiry whether there was a reasonable probability that the jury could reach a verdict notwithstanding their declared deadlock."

Jurors had deliberated for approximately four and a half hours on the first day and approximately three and a half hours on the second day,[3] when the jury sent the following note to the court: "At this point we are split on our position of guilt or innocent. After multiple votes and no movement in votes it is our contention that a verdict can [*sic*] be reached based on the evidence provided."

After the court read the note to the prosecutor and Lehman, this exchange occurred:

"[Prosecutor]: Have you firecrackered them yet, Judge?

"Mr. Lehman: What is a fire cracker?

"The Court: No, because that would require you to be here. So if that happened, you would know about it. I am about to explain what I intend to do. [¶] So I'm going to call them in, and I'm going to give them a further instruction that may assist them in their deliberations, and then I'm going to send them back. And if they try those further suggestions and they are not able to reach a verdict, then at that point I would be inclined to declare a mistrial but not right now.

---

[3] A portion of the time in deliberations was devoted to reading back testimony to the jury.

7

"Mr. Lehman:  Would that be tomorrow or at the end of the day today?

"The Court:  It might be later today.

"Mr. Lehman:  Are we going to read off the instructions, or is there just like a general instruction that is always given at this point?

"The Court:  It's a general instruction that I give.  But I don't want to waste time so can we get them in?

"The Bailiff:  Yes.

"The Court:  I just wanted to go over what has transpired and where we're at and what we're going to do.  [¶] . . . [¶]

"Mr. Lehman:  Are they going to tell us -- not the direction of the split but the number?

"The Court:  I'm not even going to ask that."

When the jurors reentered the courtroom, the trial court confirmed with Juror No. 4 that the word "can" in the note was an error and "cannot" was meant.  The court asked how many votes had been taken and Juror No. 4 said, "Two."

The trial court then addressed the jury:

"All right.  So I appreciate that you have been deliberating for a while now and that you've been working hard, and people are seeing the case differently, and I'm sure that creates some difficulties.  But I'm going to ask that you continue your deliberations.  So I have a further instruction that I'm going to read that it's my hope will be helpful.

"I'm not yet convinced that you will not be able to come to a verdict.  It is not uncommon for a jury which initially reported it was unable to reach a verdict to ultimately be able to arrive at one . . . on one or more of the counts before it.  So I'm going to direct that you continue to deliberate and will provide you some further instructions to assist you in your deliberations.

8

"Your goal as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard for the consequences of your verdict regardless of . . . how long it takes to do so.

"It is your duty as jurors to consider, weigh, and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to reexamine your own views, or to request your fellow jurors to reexamine theirs.

"You should not hesitate to change a view you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong.

"Fair and effective jury deliberations require a frank and forthright exchange of views. As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.

"You have discretion to conduct your deliberations in any way you deem appropriate. May I suggest that since you have not been able to arrive at a verdict using the methods you have used thus far, that you consider trying new methods at least temporarily.

"For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa. This might enable you to better understand the others' positions.

"By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberations. I also suggest that perhaps you reread CALCRIM Instructions 200 -- that is the very first instruction and 3550, which is the very last instruction. These

9

instructions pertain to your duties as jurors and make recommendations on how you should deliberate.

"The decision the jury renders must be based on the facts and the law. You must determine what facts have been proved from the evidence received in the trial and not from any other source. Second, you must accept and follow the law as I have stated it to you, regardless of whether you agree with it.

"If anything concerning the law said by [the prosecutor] or Mr. Lehman in their arguments or at any other time during the trial conflicts with my instructions, you, of course, must follow my instructions. You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments, and suggestions I have made in the instructions now presented to you.

"I hope my comments and suggestions may be of some assistance to you. You're ordered to continue your deliberations at this time. If you have other questions, concerns, requests, or any communications you desire to report to me, please continue to put those in writing.

"And if there is any -- if any aspect of the law, the legal instructions, are a sticking point and a clarification of those instructions may be of benefit, that could be a request as well, and I would assess whether I could give some clarification of the law and provide that to you if that is a sticking point. So I'm going to ask that you continue deliberations."

The jury deliberated for an hour and 24 minutes more that day. The next day the jury deliberated for one hour and 55 minutes—which included another reading of testimony by the court reporter—before informing the trial court that a verdict had been reached.

The colloquy set forth above shows the trial court fully informed Lehman what the court intended to do after receiving the jury's note, that is, find out "what has transpired and where we're at," give the court's usual "firecracker" instruction to the jury to

10

continue deliberations with suggestions how jurors might come to an agreement, and declare a mistrial if jurors were still unable to reach verdict. The court also informed Lehman what it was not going to do: ask the numbers of the split in the jury's vote. The court did exactly what it said it would do. Lehman made no objection to this procedure and thereby forfeited a claim on appeal that the trial court erred. (*People v. Young* (2007) 156 Cal.App.4th 1165, 1171.)

Even assuming that Lehman had not forfeited the issue, we would reject his contention on the merits.

Section 1140 provides in relevant part that a "jury cannot be discharged" without having rendered a verdict unless, "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." "The determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 775.)

When the jury sent the note, the jury had deliberated for just over one full day. Courts have upheld denials of mistrials even after fruitless deliberations for longer periods. (See, e.g., *People v. Bell* (2007) 40 Cal.4th 582, 617 [10 hours], overruled on other grounds by *People v. Sanchez* (2016) 63 Cal.4th 665, 686 & fn. 13; *People v. Sandoval* (1992) 4 Cal.4th 155, 194-197 [14 hours over five days].)

California Rules of Court, rule 2.1036, entitled "Assisting the jury at impasse," provides that "[a]fter a jury reports that it has reached an impasse in its deliberations," the trial judge "should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict." (Cal. Rules of Court, rule 2.1036(a).)[4] Rule 2.1036 further specifies that "[i]f the trial judge determines that further action might assist the jury in reaching a verdict, the judge may: [¶] (1) Give additional instructions;

---

[4] Undesignated rule references are to the California Rules of Court.

11

[¶] (2) Clarify previous instructions; [¶] (3) Permit attorneys to make additional closing arguments; or [¶] (4) Employ any combination of these measures."  (Rule 2.1036(b).)

Rule 2.1036 does not require the trial judge to inquire of jurors about the reasonable probability of reaching a verdict.  At most, the rule recommends that the trial court ask jurors about concerns implicated in the reported impasse.  There is no mention of polling the jury.  Indeed, the California Supreme Court in *People v. Peoples* (2016) 62 Cal.4th 718, held that "a trial court does not abuse its discretion merely by declining to poll the jury as to the likelihood of reaching a unanimous verdict."  (*Id.* at p. 782.)  On the other hand, the rule does provide that trial judge may give additional instructions, as the trial court did here, to assist a jury at an impasse.  (Rule 2.1036(b)(1).)

Nonetheless, Lehman contends it was an abuse of discretion for the trial judge to instruct jurors to continue their deliberations without speaking to any of them about the probability of reaching a verdict.  In *People v. Moore* (2002) 96 Cal.App.4th 1105 (*Moore*), however, we rejected a claim that the trial court should have questioned the jury as to whether there was a reasonable probability of reaching a verdict before giving the firecracker instruction.  We noted "section 1140 vests the trial court with discretion to determine whether there is a reasonable probability of agreement among jurors who have reported an impasse.  [Citations.]"  (*Id.* at p. 1121.)  We concluded that it was a proper exercise of discretion for the trial court to determine further deliberations might be beneficial without express questioning of the jury "presumably because of the relatively brief duration of deliberations conducted by the jurors before they announced they could not reach a verdict."  (*Id.* at p. 1122.)

Lehman contends that that the trial court erred in deciding to simply instruct the jury "after lengthy deliberations in a simple case" involving eyewitness identification.  We disagree.  Lehman acknowledges that the jury "asked seven questions directly related to the eyewitness identification evidence" and took two votes over eight hours of deliberations.  The fact the jury asked seven questions indicates the case was not as

12

simple and straightforward as Lehman asserts and eight hours is not a lengthy period of deliberation. In any event, the jury deliberated for just over three hours following receipt of the firecracker instruction before reaching a verdict. In *Moore, supra*, 96 Cal.App.4th 1105, the jury returned a verdict in two additional hours of deliberation (*id*. at p. 1120) and we noted that "[t]he fact the jury was able to reach a verdict relatively quickly after being further instructed reflects the court properly exercised its discretion." (*Id.* at p. 1122.)

On this record, we do not find an abuse of discretion in the trial court's failure to make a formal inquiry of the jury regarding the helpfulness of further deliberations before providing a supplemental instruction directing them to continue deliberations.

*Instruction to Jury to Continue Deliberations*

In a related contention, Lehman maintains that the trial court's decision to give the firecracker instruction was coercive. Lehman argues that, after eight hours of deliberation and seven questions to the court, the jury had thoroughly considered the pertinent issue of identity of the perpetrator and would have understood any instruction to continue deliberations as a direction to reach a verdict. Lehman points to the court's prefatory comment as confirming that conclusion. "Specifically, the court told the jury 'I'm not yet convinced that you will not be able to come to a verdict.' In other words, the judge clearly implied that he believed the jury *would be able* to come to a verdict."

As noted, Lehman did not object to this instruction when it was given, thereby forfeiting any claim of error. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1038 (*Lewis and Oliver*); *People v. Neufer* (1994) 30 Cal.App.4th 244, 253-254.)

However, Lehman did challenge the instruction in a motion for new trial, which the court denied. Lehman argued that the "wording" of the instruction was "reversible error."

13

The court responded: "I understand your argument that the standard instruction when a jury comes back reporting that they are at that point unable to reach a verdict, a unanimous verdict, should not have been given and it was in error. It's a standard instruction. It's reflected in the CALCRIM book of standard instructions, and it's consistent with applicable case law." The court continued that "if you think there was an error in that instruction or the wording, you can bring it up on appeal, but there is no -- this is not something that you have to preserve at this point."

Defendant does not claim on appeal that the court erred in denying his motion for new trial. (See § 1181, subd. (5).) Nonetheless, we consider his claim that the instruction was coercive on the merits and reject it.

As the trial court noted, much of the wording of the instruction is taken from CALCRIM No. 3551, as well as the firecracker instruction we approved in *Moore, supra*, 96 Cal.App.4th at pages 1119-1121 (which was a source for CALCRIM No. 3551, Judicial Council of California Criminal Jury Instructions (2020 ed.) p. 1055).

Further, Lehman has not identified any language in the trial court's instruction as coercive and we do not find any. (Compare *People v. Hinton* (2004) 121 Cal.App.4th 655, 659-660 [court's remarks to deadlocked jury contained all three components of an improper instruction, (1) suggesting minority jurors defer to the majority's view, (2) implying the case would be retried if the jury could not agree, and (3) emphasizing the costs of trial and implying that further costs would be expended in a retrial].)

Finally, we do not view the court's prefatory comment as suggesting a verdict must be reached, in light of the instruction that "[y]our goal as jurors should be to reach a fair and impartial verdict *if you are able to do so . . . .*" (Italics added.) The court repeated this statement: "It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge *if you can do so without violence to your individual judgment.*" (Italics added.) "Telling a jury it should reach a verdict if it can . . . is not coercive." (*People v. Santiago* (2009) 178 Cal.App.4th 1471, 1476; *People v. Whaley* (2007)

152 Cal.App.4th 968, 975 [the phrase "if you can" indicates that jurors may deadlock and does not tell them they must render a verdict].) The court's comment simply provided jurors with an explanation for the trial's instruction to continue deliberating.

We conclude there was no error in the trial court's provision of the firecracker instruction in this case.

*CALCRIM No. 315*

The trial court gave the jury the pattern instruction on eyewitness identification, CALCRIM No. 315. The instruction advised the jury that "[a]s with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony." The instruction continued, "[i]n evaluating identification testimony, consider the following questions," and set forth 14 separate questions. The eleventh question was: "How certain was the witness when he or she made an identification?"

Lehman contends that "[i]nstructing the jury to consider the eyewitness's confidence when evaluating the reliability of the identification violated the appellant's Fourteenth Amendment right to a fair trial."

Lehman did not object to this instruction or request that the witness certainty factor be eliminated or modified. Lehman thereby forfeited this claim of error. (*People v. Sánchez* (2016) 63 Cal.4th 411, 461 (*Sánchez*) ["If defendant had wanted the court to modify the [certainty] instruction, he should have requested it. The trial court had no sua sponte duty to do so"]; *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199-200 (*Rodriguez*) ["Rodriguez argues CALCRIM No. 315 violates his Fourteenth Amendment due process rights because it tells the jury to consider eyewitness certainty. Rodriguez's counsel did not object at trial. This is forfeiture"].)

Even were this claim preserved for appeal by a timely objection, we would reject it on the merits. Lehman refers to a "meta-analysis of scientific studies" that eyewitness confidence does not correlate with eyewitness accuracy. This argument is not new. The

15

California Supreme Court in *Sánchez* acknowledged that "some courts have disapproved instructing on the certainty factor in light of the scientific studies." (*Sánchez, supra*, 63 Cal.4th at p. 462.) The court upheld its previous decisions approving an instruction including the certainty factor. (*Ibid.*, citing *People v. Wright* (1988) 45 Cal.3d 1126, 1141; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232.) We are bound to follow the Supreme Court's holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Lehman directs our attention to *People v. Lemcke*, review granted October 10, 2018, S250108, in which the Supreme Court granted review to consider whether the certainty factor in CALCRIM No. 315 violates due process. We observe, as did our sister court, "the Supreme Court has not issued an opinion in *Lemcke*. *Sánchez* remains valid law." (*Rodriguez, supra*, 40 Cal.App.5th at p. 200.)

We also note that the United States Supreme Court continues to consider " 'the level of certainty demonstrated' " by an eyewitness as a relevant factor in evaluating the accuracy of a witness's identification. (See *Perry v. New Hampshire* (2012) 565 U.S. 228, 239, fn. 5 [181 L.Ed.2d 694]; *Arroyo v. Biter* (C.D.Cal., June 22, 2012, No. ED CV12-00088-GAF (RZ)) 2012 U.S.Dist. LEXIS 180579, pp. *13-14 ["Petitioner has pointed to no United States Supreme Court case holding that due process is violated when, in assessing the reliability of a witness's identification of a defendant, the jury considers the witness's level of certainty in making the identification. On the contrary, the existing Supreme Court precedent appears to approve of such considerations"].) Lehman has not cited any California case that found a violation of the federal or California Constitutions in instructing the jury that witness certainty is a factor in evaluating eyewitness identification testimony. Lehman's citation to psychology journal articles and cases from other states does not persuade us to conclude that such a violation

16

occurred here. (See, e.g., *State v. Lawson* (2012) 352 Or. 724; *State v. Ledbetter* (2005) 275 Conn. 534; *State v. Delgado* (2006) 188 N.J. 48.)[5]

We conclude the trial court did not err in instructing the jury with CALCRIM No. 315.

*CALCRIM No. 376*

The trial court also instructed the jury with CALCRIM No. 376, "Possession of Recently Stolen Property as Evidence of a Crime."[6]

As given by the court, CALCRIM No. 376 stated: "If you conclude that the defendant knew he possessed property, and you conclude that the property had, in fact, been recently stolen, you may not convict the defendant of burglary based on those facts alone. However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed burglary.

"The supporting evidence need only be slight and need not be enough by itself to prove guilt. You may consider how, where, and when the defendant possessed the property, along with any other relevant . . . circumstances tending to prove his guilt of burglary.

"Remember that you may not convict the defendant of any crime unless you are

_____

[5] Lehman argues that *Sánchez* is distinguishable because it considered CALJIC No. 2.92, not CALCRIM No. 315, which Lehman claims differ. However, *Sánchez* itself cited CALCRIM No. 315 as including a certainty factor comparable to CALJIC No. 2.92. (*Sánchez, supra*, 63 Cal.4th at p. 461; see also *Webb v. Holland* (E.D.Cal., October 30, 2019, No. 2:16-cv-01368 TLN AC) 2019 U.S. Dist. LEXIS 188522, p. *54 ["The certainty factor in CALCRIM No. 315 is indistinguishable in substance from that set forth in CALJIC No. 2.92 . . ."].)

[6] Again, Lehman did not object to the instruction. However, courts have held that failure to object does not forfeit a challenge to CALCRIM No. 376. (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574 (*O'Dell*); *People v. Lopez* (2011) 198 Cal.App.4th 698, 708 (*Lopez*).)

convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

Next the court instructed the jury with CALCRIM No. 1700 on burglary, which stated in relevant part: "The defendant is charged with burglary in violation of Penal Code Section 459. To prove that the defendant is guilty of this crime, the People must prove, number one, the defendant entered a building, and, number two, when he entered the building, he intended to commit theft.

"In deciding whether the defendant intended to commit theft, please refer to the separate instruction that I have given you on that crime.

"A burglary was committed if the defendant entered with the intent to commit theft. The defendant does not need to have fully committed theft as long as he entered with the intent to do so."

The court then instructed the jury with CALCRIM No. 1800, as referenced in CALCRIM No. 1700: "To prove . . . that defendant committed a theft, the People must prove that, one, defendant took possession of property owned by someone else, two, the defendant took the property without the owner's consent, three, when the defendant took the property, he intended to deprive the owner of it permanently, and, four, the defendant moved the property even a small distance and kept it for any period of time however brief."

Lehman asserts that CALCRIM No. 376 "created an alternate theory of guilt where the jury could find appellant guilty of burglary based on two 'essential facts' instead of upon proof of each statutory element of the offenses [*sic*]."[7]

---

[7] (*People v. Green* (1980) 27 Cal.3d 1, 69 [reversal required when a verdict may rest on two or more alternate legal theories, some legally correct and others invalid, unless the record shows the verdict necessarily rests on a legally valid ground]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1127-1128 [distinguishing legally invalid theories from factually unsupported theories].)

18

In reviewing a challenge to a jury instruction, we consider the instructions given as a whole. We assume jurors can understand and correlate all the instructions given. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1294.) A single instruction may not be judged in isolation but must be viewed in the context of the entire charge. (*People v. Frye* (1998) 18 Cal.4th 894, 957, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) We conduct an independent review of issues pertaining to instructions. (*People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411; see also *Lopez, supra*, 198 Cal.App.4th at p. 708 ["We review de novo whether a jury instruction correctly states the law. [Citation]"].) To reverse the judgment based on instructional error, we must find a reasonable likelihood that "any allegedly erroneous instruction would have led the jury to misapply the law." (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1155.)

"Similar to its predecessor, CALJIC No. 2.15, CALCRIM No. 376, is based on a 'long-standing rule of law [that] allows a jury to infer guilt of a theft-related crime from the fact a defendant is in possession of recently stolen property when coupled with slight corroboration by other inculpatory circumstances [that] tend to show guilt.' [Citation.]" (*Lopez, supra*, 198 Cal.App.4th at p. 709, fn. omitted.)

Lehman acknowledges that the California Supreme Court and Courts of Appeal have repeatedly upheld CALCRIM No. 376 and CALJIC No. 2.15. (See, e.g., *People v. Gamache* (2010) 48 Cal.4th 347, 375-376; *People v. Holt* (2010) 15 Cal.4th 619, 677; *Lopez, supra*, 198 Cal.App.4th at p. 712; *O'Dell, supra*, 153 Cal.App.4th at p. 1576.)

Lehman attempts to distinguish these cases based on the final admonishment in CALCRIM No. 376 that the jury may not convict unless it is "convinced that each fact essential to the conclusion that the defendant is guilty of [the] crime has been proved

19

beyond a reasonable doubt."[8]  Lehman maintains that "CALCRIM No. 376 is a stand-alone theory of guilt—complete with required elements and a burden of proof—whereas CALJIC no. 2.15 was not."  According to Lehman, "each fact essential to the conclusion that the defendant is guilty" in CALCRIM No. 376 would be understood by the jury to refer only to (1) possession of stolen property, and (2) supporting evidence tending to prove guilt.

Lehman misreads CALCRIM No. 376.  The instruction did not tell the jurors they could ignore the elements of burglary to find Lehman guilty.  The instruction only addressed the sufficiency of the evidence, not the factual elements of burglary that the prosecution was required to prove.  The final paragraph of the instruction told jurors they could convict Lehman only if they found all the factual elements of the crime true beyond a reasonable doubt.  The jury was not left in doubt what were the elements of burglary.  Immediately after instructing the jury with CALCRIM No. 376, the trial court gave CALCRIM No. 1700, which set forth the elements of the crime.

As noted above, instructions are not to be considered in isolation, and must be considered as a whole.  On that score, the trial court began by giving CALCRIM No. 200, which included the admonishment:  "Pay careful attention to all of these instructions and consider them together."  The court gave CALCRIM No. 220 on reasonable doubt which included the directions that "[w]henever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt" and that "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and

---

[8] Lehman cites no authority regarding a claimed due process violation based on the *inclusion* of the final admonishment in CALCRIM No. 376 that CALJIC No. 2.15 lacks.  In fact, it is the other way around.  The California Supreme Court recently rejected a claim regarding the *omission* of a similar reminder in CALJIC 2.16, on dog-tracking evidence, which the court said bears a substantial similarity to CALJIC No. 2.15 and CALCRIM No. 376.  (*People v. Westerfield* (2019) 6 Cal.5th 632, 709.)

you must find him not guilty." In addition to CALCRIM No. 1700, the trial court instructed the jury with CALCRIM No. 1800, which set forth the elements of theft, the crime that Lehman must have intended to commit in order for the jury to find him guilty of burglary. The court also gave CALCRIM No. 1701 on first degree burglary, of which he was convicted, telling the jury: "The People have the burden of proving beyond a reasonable doubt that the burglary was first degree rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree burglary."

Lehman's argument requires us to accept that the jury ignored all these instructions in favor of Lehman's interpretation of CALCRIM No. 376, which we may not do. Considering the instructions in their entirety, and crediting jurors with common sense and intelligence, we conclude the jury was adequately and correctly informed that it must find each element of the burglary charge beyond a reasonable doubt to find Lehman guilty.

*Pitchess Motion*

Lehman contends that the trial court improperly denied his motion for discovery of the personnel records of Detective Vina for lack of good cause. Lehman argues he "specifically alleged that Detective Vina had admitted to falsely arresting him, and appellant's sole defense was that he was falsely accused of the crime. Thus, appellant met the good cause requirement: there was a direct link between the discovery sought— prior instances of false arrests—and the pending charge, and the discovery would have supported appellant's defense that he was falsely arrested." We disagree.

On June 6, 2018, Lehman filed a *Pitchess* motion.[9] Lehman sought discovery of

---

[9] Lehman filed multiple *Pitchess* motions that were denied by the trial court on various grounds. On appeal, Lehman challenges only the court's ruling on his motion filed on June 6, 2018.

personnel records of Detective Vina and five other officers from the Elk Grove Police Department and Deputy Avalos from the Sacramento County Sheriff's Department regarding "[a]cts of dishonesty," including conspiring with fellow officers to direct an investigation in a way contrary to the evidence, planting or tampering with evidence, conspiring to frame or set up suspects, illegally obtaining evidence, acts of class-based prejudice, lying to protect fellow officers, conspiring to mislead investigations, encouraging a corrupt work environment, prejudicial and malicious assignment of officers to the case, providing false information to an investigation, false and untrue identifications of individuals (in the case of Deputy Avalos), and conspiring to alter the direction of an investigation.

In 11 pages of Lehman's supporting declaration, he alleged misconduct by these seven officers before and after his arrest. In addition, regarding Detective Vina specifically, Lehman stated that, at the conclusion of an interview, "Detective Vina spoke to the defendant off Camera [*sic*] and told him that the Victim was a good friend of his and that he would Go [*sic*] to any means 'To book your ass' and described how Elk Grove has much more money, resources and better personnel than the Sacramento Sheriff's Department to do so with." Lehman sought discovery of complaints regarding Detective Vina's "Accepting cases where he has a personal relationship with the victim, example; [*sic*] Friend, Family, Neighbor, Lover, Supportive, Business ect. [*sic*][.]"

The trial court denied the motion for failure to establish good cause and exceeding the scope of permissible discovery. The court found that Lehman was "basically saying that all these officers engaged in a conspiracy." The court observed that Lehman alleged that Detective Vina "said now I want to set this guy up because the victim was my neighbor" and "gathered these officers together in some grand conspiracy," so "they're all dishonest because they all decided to tamper with evidence or plant evidence." The court noted that Lehman's request "is all based on the fact that because Detective [Vina] was a neighbor slash friend of the victim, that every officer involved in this case basically

22

was involved in . . . a conspiracy with Detective [Vina]. [¶] You don't have any . . . other evidence against these officers for your position other than if [Vina] is bad and was trying to tamper with the evidence that -- that he must have . . . gathered all these other officers into his conspiracy."

The procedures articulated in *Pitchess* for discovery of personnel records of law enforcement officers have been codified in Evidence Code sections 1043 through 1047. Under these procedures, the trial court must find "good cause" for the discovery requested based on showing that the records and complaints are "material[] . . . to the subject matter involved in the pending litigation." (Evid. Code, § 1043, subd. (b)(3).) To establish materiality, the party requesting the records must (1) set forth a "specific" and "plausible" "factual scenario of officer misconduct," and (2) must establish both how the information sought is "similar" to the alleged misconduct and how the information would support a defense to the People's case. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1021, 1025-1027; *California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1021.) A showing of "good cause" requires that the "factual scenario of officer misconduct" must present an "alternate version of the facts" that is "internally consistent" and comports with "common sense." (*Sanderson, supra*, 181 Cal.App.4th at pp. 1340-1341; *People v. Galan* (2009) 178 Cal.App.4th 6, 12-13 (*Galan*).) The proposed scenario need not be "persuasive," "reasonably probable" or even "credible." (*Thompson, supra*, 141 Cal.App.4th at pp. 1316-1317; *Sanderson*, at p. 1340; *Warrick*, at pp. 1025-1026.) But the scenario must be more than merely "possible," "conceivable" or "imaginable." (*Thompson*, at pp. 1318-1319.)

The trial court is vested with broad discretion in ruling *Pitchess* motions (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086), and we review the trial court's ruling for abuse of discretion. (*Lewis and Oliver, supra*, 39 Cal.4th at p. 992.)

The trial court did not abuse its discretion in determining that Lehman did not set forth a plausible factual scenario. It is not plausible that seven officers conspired to

23

"fabricate virtually all the events preceding and following [a defendant's] arrest" based on the explanation that one officer knew the victim. (*Thompson, supra*, 141 Cal.App.4th at p. 1318.) As the trial court noted, Lehman had no evidence or explanation for the existence of this conspiracy other than Detective Vina was "bad" and all the other officers went along with him to fabricate evidence and make false statements against Lehman. He did not set forth, however, what the officers' motivation would have been to join in a conspiracy to vindicate an acquaintance of Detective Vina.

The implausibility of Lehman's claimed conspiracy is highlighted by the fact that it includes Deputy Avalos, who is not a member of the Elk Grove Police Department but a deputy sheriff in the Sacramento County Sheriff's Department. The misconduct Lehman attributes to Deputy Avalos that is the basis for the discovery request is falsely identifying Lehman as the person who dropped the backpack and fled, when, according to Lehman, the deputy did not get a clear view of the suspect's face. Lehman does not explain how, when or why Deputy Avalos would enter into a conspiracy directed by Detective Vina to give false testimony to frame Lehman. The notion of allegiance between members of the Elk Grove Police Department that seemingly underlies Lehman's theory of an implicit conspiracy among the officers from the department involved in the investigation does not extend to Deputy Avalos. Indeed, the statement that Lehman attributes to Detective Vina disparages the Sacramento County Sheriff's Department.

On appeal, Lehman asserts that he is only seeking the personnel records of Detective Vina. Lehman fails to mention that, as set forth above, he based his showing of good cause to the trial court on the existence of an implausible conspiracy among six officers from the Elk Grove Police Department and one officer from the Sacramento County Sheriff's Department to falsify virtually every item of evidence in the People's case. A defendant generally may not change his theory on appeal. (*People v. Pecci* (1999) 72 Cal.App.4th 1500, 1503; *People v. Borland* (1996) 50 Cal.App.4th 124, 129.)

24

Even if Lehman could, without the old theory attributing various acts of misconduct to other officers as part of a conspiracy, Lehman no longer presents an "alternate version of the facts" that is "internally consistent," for example, to explain the undisputed fact that his sweatshirt and his T-shirt with his DNA on them were found in the trash can or Deputy Avalos's identification of Lehman as the man who dropped the backpack and ran. (*Sanderson, supra*, 181 Cal.App.4th at pp. 1340-1341; *Galan, supra*, 178 Cal.App.4th at pp. 12-13.) Lehman's new theory does not provide "good cause" for *Pitchess* review.

*Senate Bill No. 136*

Under section 667.5, subdivision (b), the trial court imposed two 1-year enhancements for prior prison terms Lehman served for (1) counterfeiting (§ 480), and (2) for vehicle theft and bringing drugs into jail (§ 4573; Veh. Code, § 10851).

In supplemental briefing, the parties agree that Senate Bill No. 136, amending section 667.5, subdivision (b), applies retroactively and this case should be remanded to the trial court to strike two 1-year enhancements added to his sentence under the statute. However, as the People correctly note, the trial court imposed the maximum penalty for residential burglary. Therefore, we need not remand for resentencing, but will simply strike the enhanced sentence imposed under current section 667.5, subdivision (b).[10]

---

[10] As amended section 667.5, subdivision (b) limits the one-year enhancement to a prior prison term imposed for "a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code." While the amendment became effective January 1, 2020, (Stats. 2019, ch. 590, § 1) we assume, absent a clear indication to the contrary, that the Legislature intended an "amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323; *In re Estrada* (1965) 63 Cal.2d 740, 742-748; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341.) The amendment applies here. However, "[b]ecause the trial court imposed the maximum possible sentence, there is no need for the court to again exercise its sentencing discretion." (*Lopez*, at p. 342, citing *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.)

25

## DISPOSITION

The judgment is modified to strike the two 1-year enhancements imposed under section 667.5, subdivision (b).  With this modification, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment deleting reference to the enhancements and reflecting a total prison sentence of six years.  The court shall forward a certified copy of the same to the Department of Corrections and Rehabilitation.


                                        /s/
                                        RAYE, P. J.



We concur:



        /s/
BLEASE, J.



        /s/
DUARTE, J.


26